FILED
2015 JUL 24 AM 11: 29
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY: ___

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>   v.<br><br>INEZ TAPIA,<br><br>   Defendant. | No. CR CR 15 00413<br><br>I N F O R M A T I O N<br><br>[18 U.S.C. § 1035: False Statements Relating to Health Care Matters] |

The United States Attorney charges:

[18 U.S.C. § 1035]

A.  INTRODUCTORY ALLEGATIONS

At all times relevant to this Information:

1.  Century Home Healthcare, Inc. ("Century") was a home health agency ("HHA"), with its business office in Los Angeles County, within the Central District of California. From in or around May 2009, to in or around June 2013, Century was located at 17050 Chatsworth Street, Suite 215, Granada Hills, California 91344. From in or around June 2013 to in or around February 2015, Century was located at 11145 Tampa Avenue, Suite 19B, Porter Ranch, California 91326.

2.   Defendant INEZ TAPIA ("TAPIA") was an owner, the Chief Executive Officer ("CEO"), and Chief Financial Officer ("CFO") of Century.  Defendant TAPIA was also a licensed vocational nurse ("LVN").  Defendant TAPIA was not a registered nurse ("RN").

The Medicare Program

3.   Medicare was a federal health care benefit program, affecting commerce, that provided benefits to individuals who were 65 years and older or disabled.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

4.   Individuals who qualified for Medicare benefits were referred to as Medicare "beneficiaries."  Each beneficiary was given a unique health insurance claim number ("HICN").

5.   HHAs and other health care providers that provided medical services that were reimbursed by Medicare were referred to as Medicare "providers."  To participate in Medicare, providers were required to submit an application in which the provider agreed to comply with all Medicare-related laws and regulations.  If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number," which was used for the processing and payment of claims.

6.   A health care provider with a Medicare provider number could submit claims to Medicare to obtain reimbursement for services rendered to Medicare beneficiaries.

7. Most providers submitted their claims electronically pursuant to an agreement they executed with Medicare in which the providers agreed that they would be responsible for all claims submitted to Medicare by themselves, their employees, and their agents; that they would submit claims only on behalf of those Medicare beneficiaries who had given their written authorization to do so; and that they would submit claims that were accurate, complete, and truthful.

8. Medicare generally reimbursed a provider for home health services only if, among other requirements, the Medicare beneficiary was homebound and did not have a willing caregiver to assist him or her; the beneficiary needed skilled nursing services or physical or occupational therapy services; the beneficiary was under the care of a qualified physician who established a plan of care (CMS Form 485) for the beneficiary, signed by the physician and also signed by an RN from the HHA; and the skilled nursing services or physical or occupational therapy were medically necessary.

9. To determine the proper level of care for a particular beneficiary and ultimately to help determine the amount of payment, Medicare required that HHAs perform an initial evaluation, which was a patient-specific comprehensive assessment that accurately reflected the patient's current health and provided information to measure his or her progress. HHAs were required to update or revise a comprehensive assessment for each 60 day period when the patient was recertified to continue receiving home health benefits.

10. In making assessments, HHAs were required to use a tool called the Outcome and Assessment Information Set ("OASIS"). The standard OASIS form was a detailed checklist on which a nurse examining a prospective home health patient checked off applicable boxes as he or she examined and interviewed the patient face-to-face regarding every aspect of the patient's physical and mental health, history, and living conditions.

11. Medicare required that assessments be performed and the OASIS completed and signed by an RN (or PT or OT if only therapy services were to be provided).

12. Medicare also required that a HHA maintain a clinical record of services to each beneficiary, including signed and dated clinical and progress notes recording each home visit made to the beneficiary. While the form of progress notes could vary, all progress notes were required to contain the identity of the HHA employee who performed the visit, the name of the patient, and the type of service performed. As a Medicare provider, Century was required to provide these and other documents to Medicare in the event that Medicare requested such documents.

13. Medicare compensation to HHAs was based on a prospective payment system ("PPS"), under which Medicare paid HHAs a base payment that was adjusted based on the severity of the beneficiary's health condition and care needs as represented by the OASIS data.

14. Under PPS, HHAs were paid in two steps for each 60-day episode of care to a given beneficiary. At the outset of an

episode, the HHA would submit a Request for Anticipated Payment ("RAP") identifying the applicable PPS payment category (based on the severity of the patient's condition and needs as computed from the OASIS data) and would receive 50-60% of the anticipated total payment for that category. At the conclusion of the episode, the HHA would submit a final claim for payment, reporting the actual number, length, and type of visits made. Assuming a certain threshold number of visits were reported as having been made, the HHA would receive the remaining 40%-50% of the PPS payment.

15. Under this system, a provider could receive a payment for the episode higher than the amount it claimed.

16. CMS contracted with regional contractors to process and pay Medicare claims. National Government Services ("NGS") was the contractor that processed and paid Medicare claims for home health services in Southern California during the relevant time period.

17. To bill Medicare for home health services, a provider submitted a claim form (Form UB-04) to NGS. When a Form UB-04 was submitted, usually in electronic form, the provider certified: (a) the contents of the form were true, correct, and complete; (b) the form was prepared in compliance with the laws and regulations governing Medicare; and (c) the services being billed were medically necessary.

18. A Medicare claim for payment was required to set forth, among other things, the following: the beneficiary's name and unique Medicare identification number; the type of services provided to the beneficiary; the date that the services were

provided; and the name and Unique Physician Identification number ("UPIN") of the physician who prescribed or ordered the services.

B. THE SCHEME

19. Beginning in or around January 2010, and continuing through in or around February 2015, in Los Angeles County, within the Central District of California, and elsewhere, in a matter involving a health care benefit program, specifically Medicare, and in connection with the delivery of and payment for a health care benefit, item, or service, specifically home health services, defendant TAPIA knowingly and willfully (a) falsified, concealed, and covered up, by way of a trick, scheme, and device, material facts, (b) made materially false, fictitious, and fraudulent statements and representations, and (c) made and used materially false writings and documents knowing that they contained materially false, fictitious, and fraudulent statements and entries.

C. THE MANNER AND MEANS OF THE SCHEME

20. The scheme operated, in substance, as follows:

    a. Defendant TAPIA would forge the signatures of individuals on clinical documents and patient records created at Century, including home health certifications, recertifications, plans of care, patient assessments, and records of supervisory nursing visits. Defendant TAPIA would forge these signatures of individuals even though, as defendant TAPIA then well knew, the individuals whose signatures defendant TAPIA was signing had not given defendant TAPIA authorization or permission to sign their names on clinical documents and patient records. In particular,

6

Case 2:15-cr-00413-RGK   Document 1   Filed 07/24/15   Page 7 of 8   Page ID #:7


1  defendant TAPIA would fill out clinical documents and patient
2  records, and forge the signatures of a licensed RN on those
3  clinical documents and patient records, even though defendant
4  TAPIA knew the documents were required to be filled out and
5  approved by a licensed RN.
6         b.   Defendant TAPIA would further fill out and sign
7  nursing notes to make it appear that defendant TAPIA had
8  performed nursing visits for beneficiaries on particular dates
9  and times when, in truth and in fact, as defendant TAPIA then
10 well knew, defendant TAPIA had not performed those nursing
11 visits on those dates and times.  These nursing visits were not
12 performed by defendant TAPIA because defendant TAPIA, the nurse
13 who purportedly provided home health services to these
14 particular beneficiaries in the Los Angeles area, was traveling
15 outside of the Los Angeles area when the nursing visits
16 purportedly occurred.
17    21.   From on or about January 30, 2010, to on or about
18 February 12, 2015, Century submitted approximately $1,914,986 in
19 claims for reimbursement to Medicare, and Century was paid
20 $2,505,840 on those claims.
21 ///
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

D. **EXECUTION OF THE SCHEME**

22. In or about July 2010, defendant TAPIA signed a nursing note that contained a false statement that, on or about July 14, 2010, defendant TAPIA provided nursing services to Medicare beneficiary M.S.G., when in truth and in fact, and as defendant TAPIA then well knew, such services were not provided by defendant TAPIA to Medicare beneficiary M.S.G. on or about July 14, 2010.

EILEEN M. DECKER
United States Attorney

*/s/ R. E. Dugdale*

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

RICHARD E. ROBINSON
Assistant United States Attorney
Chief, Major Frauds Section

STEPHEN A. CAZARES
Assistant United States Attorney
Deputy Chief, Major Frauds Section

GEJAA GOBENA
Deputy Chief, Fraud Section
U.S. Department of Justice

ALEXANDER F. PORTER
Trial Attorney, Fraud Section
U.S. Department of Justice